**United States District Court**
For the Northern District of California

**NOT FOR CITATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL L. KORBHOLZ, as Trustee for the WALDMAN CHILDREN'S TRUST,<br><br>Plaintiff,<br><br>v.<br><br>GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY, a Colorado corporation,<br><br>Defendant. | No. C 03-03792 JSW<br><br>**ORDER:**<br><br>**1.  DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND**<br><br>**2. GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (OR ALTERNATIVELY SUMMARY ADJUDICATION OF ISSUES)** |

## I. INTRODUCTION

This matter arises out of a dispute between the parties over the termination of a life insurance policy.  Currently before the Court are Plaintiff Michael L. Korbholz's ("Korbholz") motion for partial summary judgment and Defendant Great-West Life & Annuity Insurance Company's ("Great-West") motion for summary judgment or alternatively summary adjudication of issues.

In its motion for summary judgment, Great-West contends that: (1) it terminated the policy because it did not receive a payment necessary to keep coverage in force within a requisite grace period; (2) it acted reasonably in denying an application to reinstate the policy; and (3) it did not act in bad faith in terminating the policy.

In his motion, Korbholz contends that: (1) the payment in question was timely because

he placed a check in the mail before the grace period expired; (2) that the requisite grace period ended later than Great-West contends it did and, thus, the payment was timely for this reason as well; and (3) the Waldman policy should not be forfeited. (*See* Korbholz Mot. at 2-3.)

Having considered the parties' pleadings, relevant legal authority, the pleadings and papers on file in this case, and having had the benefit of oral argument, for the reasons set forth herein, the Court DENIES Korbholz's motion and GRANTS Great-West's motion.

## II.  FACTUAL HISTORY

The following facts are undisputed. On July 1, 1986, Great-West issued a life insurance policy to Murry Waldman (the "Waldman policy"). (Declaration of Samuel Ruby ("Ruby Decl.") Ex. 16; Declaration of Patrick McKinney in Support of Korbholz Motion for Summary Judgment ("McKinney Supp. Decl.") Ex. A at 5:16-19.)[1] In April 1994, Mr. Waldman transferred ownership of the policy to a trust, for which Korbholz is the trustee. (Declaration of Michael L. Korbholz ("Korbholz Decl.") ¶ 2, Ex. A.)

### A.  The Terms of the Waldman Policy.

The premiums paid on the Waldman policy funded an interest-earning "Policy Value Account."[2] (WALD00012; Ruby Decl., Exs. 1, 5; Declaration of Don Galay ("Galay Decl."), ¶ 4.) Each month Great-West made a deduction from the Policy Value Account to cover the "Cost of Insurance." (WALD00023; Ruby Decl., Exs. 1, 5; Deposition of Don Galay ("Galay Depo.") at 24:3-20.)[3] Great-West continued to deduct premiums from the Policy Value Account on a monthly basis until the funds in the Policy Value Account were insufficient to cover the cost of insurance or until the Policy Value Account was exhausted. If the funds in the Policy Value Account were not sufficient to cover the Cost of Insurance, Great-West notified Korbholz of that fact in a Past Due Notice. (*See, e.g.,* Galay Depo. at 31:12-22; Ruby Decl., Exs. 3, 6, 9.)

---

[1] The Waldman Policy is Exhibit 16 to the Ruby Declaration and is Bates Numbered WALD00001-00029. In the remainder of this Order, the Court shall cite to the Waldman Policy by reference to these numbers.

[2] Throughout this Order, the Court uses the term "premium" in reference to payments made to fund the Policy Value Account.

[3] Excerpts from the Galay Deposition are attached as Exhibit D to the McKinney Supp. Declaration.

2

Great-West also sent Korbholz annual invoices notifying him of an amount due for the coming year. (Galay Decl., ¶ 6; Ruby Decl., Exs. 2, 7.) These annual invoices included a disclaimer, which stated that "the amount indicated on this notice may not always be sufficient to keep the policy in force without additional payments." (Ruby Decl, Exs. 2, 7.)

With respect to "Payments," the Waldman policy provides:

> Premiums are to be paid to the Company's United States Headquarters or to one of its authorized agents.
>
> If the Issue Date of the policy is prior to the Policy Date, the Cost of Insurance for the interim period will be deducted from the Policy Value Account. The first premium is due on or before the effective date of coverage. *Later premiums will be due on the first day of any month in which the Cost of Insurance exceeds the Policy Value Account.* Subject to limitations as provided in this policy, premiums paid after the first may be paid in any amount and at any time before the Paid-Up Life Insurance provision goes into effect. Receipts will be furnished upon written request.

(WALD00008 (emphasis added).)[4]

The Waldman policy also contains a "Grace Period" provision, which provides:

> The first day of each month is the due date for any premium needed for that month. Except for the first premium, *if the amount in the Policy Value Account, less any indebtedness, on the date immediately preceding the first day of a month is not sufficient to cover the monthly deduction for the Cost of Insurance for such month,* a grace period of 60 days will be allowed for the *payment of a sufficient amount to cover the monthly deduction.* Coverage will remain in force during the grace period. *If the premium due is not paid within the grace period, all coverage under this policy will cease at the end of the 60 day period.*
>
> Notice of such premium due will be mailed to the [policy] Owner and any assignee of record at least 31 days prior to the date coverage will cease.

(*Id.* (emphasis added).)

---

[4] In approximately December 2001, Great-West hired Transactions Applications Group ("TAG") to administer and process payments on certain classes of its policies. (Galay Decl., ¶ 19; Ruby Decl., Ex. 19.) TAG administered the Waldman policy.

3

**B.     The Events Giving Rise to this Dispute.**

On June 5, 2001, Great-West sent Korbholz a Past Due Notice advising him that on June 1, 2001, the funds in the Policy Value Account were not sufficient to pay for the Cost of Insurance. (Ruby Decl., Ex 6.) Great-West advised Korbholz that it required a minium payment of $1,340.47 to keep the insurance protection in force, and that this amount had to be *received* by July 31, 2001. (*Id.*) Great-West also advised Korbholz that this payment would keep the policy in force only through August 31, 2001, and suggested a payment of "$6,000.00 to avoid the policy again having an insufficient amount." (*Id.*)[5]

On June 30, 2001, Great-West sent Korbholz the Annual Statement for the period of July 1, 2000 through June 30, 2001, which showed that Policy Value Account had a negative balance in the amount of $159.08. (Ruby Decl., Ex. 5.) The Annual Statement also indicated that the Cost of Insurance for the coming year would be $6,930.00, and stated that "if no further premium payments are made, based on the guaranteed rate of interest and cost of insurance, coverage will cease in Jul. 2001." (*Id.*)

On July 27, 2001, Korbholz, by express mail sent Great-West a letter enclosing a check in the amount of $6,000.00 for the "annual premium." (*Id.*, Ex. 8.) Korbholz included the payment coupon from Great-West's annual invoice for the policy year commencing on July 1, 2001. (*Id.*) The annual invoice indicated the premium was $6000.00 but also contained the disclaimer that the amount listed might not be sufficient to cover the Cost of Insurance for the year. (*Id.*, Ex. 7.) Indeed, the July 27 payment prevented the immediate lapse in coverage, but it was not sufficient to cover the Cost of Insurance for the entire policy year running from July 1, 2001 through June 30, 2002.

As a result, on April 3, 2002, Great-West sent Korbholz another Past Due Notice, in which it notified him that as of April 1, 2002, the funds in the Policy Value Account were not

---

[5]     This was not the first time Korbholz had faced possible termination based on insufficient funds in the Policy Value Account. On August 3, 2000, Great-West sent Korbholz a Past Due Notice advising him that as of August 1, 2000, the funds in the Policy Value Account were not sufficient to keep coverage in place. (Ruby Decl., Ex. 3.) On August 14, 2000, Korbholz sent Great-West a check for $6,000.00, which prevented any lapse in coverage but was not sufficient to cover the Cost of Insurance for the policy year running from July 1, 2000 through June 30, 2001. (*Id.*, Ex. 4.)

4

sufficient to cover the Cost of Insurance. (*Id.*, Ex. 9.) In that Past Due Notice, Great-West advised Korbholz that the specified minimum payment had to be *received* by May 31, 2002, to prevent insurance protection from lapsing. (*Id.*) Great-West also advised Korbholz that the minimum payment would keep coverage in place only through June 30, 2002. Great-West again suggested a payment in the amount of $6,000.00 to avoid insufficient funds in the Policy Value Account. (*Id.*) This past due notice bears a received stamp from Korbholz's office dated April 8, 2002. (*Id.*; *see also id.*, Ex. 101 at 27:2-28:5.)

On May 28, 2002, Korbholz prepared a check for the minimum amount due on the Waldman policy, and sent it to TAG via U.S. mail. (Ruby Decl., Ex. 10; Korbholz Decl., ¶¶ 6-7.) This check bears a stamp imprinted upon it by TAG as follows: "774495 JN 4 02." (Ruby Decl., Ex. 10.) The parties do not agree about when Great-West received this check.

On June 5, 2002, Great-West sent Korhbolz a notice advising him that it had terminated the Waldman policy due to insufficient funds. (*Id.*, Ex. 11.) In the termination notice, Great-West advised Korbholz that he could apply for reinstatement by completing an enclosed application and by returning the application with a payment of $6,000.00. That notice also states that Great-West would consider reinstatement upon receipt of the application and payment. (*Id.*)

On July 2, 2002, Korbholz sent Great-West letter in which he stated "[e]nclosed please Mr. Waldman's [*sic*] Application for Reinstatement of Life Insurance and a check in the amount of $6,000 payable to Great-West Life in order to reinstate this policy." (*Id.*) The application for reinstatement disclosed that Mr. Waldman had undergone various heart-related surgeries. (*Id.*) The cover letter and application bear a stamp imprinted upon them by TAG as follows: "RECEIVED JULY 3, 2002." (McKinney Decl., Ex. K.) TAG processed the July 2 check, and it bears the following stamp: "776187 JL 10 02." (*Id.*, Ex. N.)

After receiving Mr. Waldman's application for reinstatement, Great-West requested Mr. Waldman's medical records. Upon review of those records and the application, Great-West declined to reinstate the application. (Declaration of Joel Nelson ("Nelson Decl."),

5

¶¶ 2-4; Ruby Decl., Ex. 13.) Great-West sent Korbholz checks in the amount of $1,853.95 and $6,000.00 to reimburse him for the checks he sent to Great-West on May 28, 2002 and July 2, 2002, respectively. (*Id.*, Exs. 14-15.)

Korbholz contested Great-West's decision to terminate the Waldman policy and, on August 13, 2003, filed this suit against Great-West for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing.

### III. ANALYSIS

**A.      Legal Standards Applicable to Summary Judgment.**

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248.

If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, that party must produce evidence which either negates an essential element of the non-moving party's claims or that party must show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the party moving for summary judgment does bear the burden of proof at trial, that must produce evidence that would

1  entitle him or her to a directed verdict if the evidence went uncontroverted at trial. *C.A.R. Transp.*
2  *Brokerage Co., Inc. v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000).

3  Once the moving party meets his or her initial burden, the non-moving party must go
4  beyond the pleadings and, by its own evidence, "set forth specific facts showing that there is a
5  genuine issue for trial." Fed. R. Civ. P. 56(e). In order to make this showing, the non-moving
6  party must "identify with reasonable particularity the evidence that precludes summary judgment."
7  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). If the non-moving party fails to make this
8  showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

9  **B.    Evidentiary Rulings and Korbholz's Motion to Strike.**

10  In support of its position on the issue of when Great-West received the May 28, 2002,
11  check, Korbholz asks the Court to take judicial notice of the fact that the U.S. Postal Service
12  advertises that first class mail should arrive at its destination between one and three days after it is
13  mailed. "Although it may be true that the Post Office advertises its attempt to deliver locally
14  designated mail overnight, this court does not take judicial notice that the Post Office delivers the
15  check in question overnight or that the check in question was probably delivered overnight. Both
16  propositions are disputable and not appropriately admitted as facts under Rule 201." *In re Mora*,
17  199 F.3d 1024, 1026 n.3 (9th Cir. 1999) Accordingly, this request is DENIED.

18  Korbholz also objects to the Declarations of Don Galay, Pamela Anderson, and Joel
19  Nelson on a number of grounds and moves to strike those portions of Great-West's briefs that
20  refer to that evidence. The motion to strike is DENIED.

21  The Court OVERRULES IN PART Korbholz's objections to paragraphs 3-8 and 19 of
22  the Galay Declaration, to the extent Korbholz objects on the ground that Mr. Galay does not have
23  personal knowledge of the facts set forth therein. Mr. Galay's declaration reveals that he has
24  personal knowledge of and is familiar with flexible premium policies, the type of policy at issue in
25  this case, and that he signed the agreement between Transactions Application Group ("TAG") and
26  Great-West.

27  The Court also OVERRULES IN PART Korbholz's objection to paragraphs 3-8 of the
28  Galay Declaration on the ground that Mr. Galay purports to interpret the Waldman policy. In these

1  paragraphs Mr. Galay does not purport to interpret the Waldman policy but, rather, based on his
2  experience with this type of policy explains the manner in which it functions and explains Great-
3  West's procedures with respect to its policies. The Court did not need to consider paragraphs 11-
4  18 and 20-25 of Mr. Galay's declaration in reaching its decision and, thus, expresses no opinion on
5  Mr. Korbholz's objections to these paragraphs.

6        Korbholz's objections to the Anderson Declaration on the ground that Ms. Anderson lacks
7  personal knowledge of the stated facts are OVERRULED IN PART. Ms. Anderson's testimony
8  on TAG's standard operating procedures is based upon her personal knowledge as TAG's
9  Premium Accounting Manager. The Court has not considered the facts set forth in Ms. Anderson's
10  declaration that do not pertain to TAG's standard operating procedures and, therefore, expresses
11  no opinion on Korbholz's objections to those facts.

12        Korbholz's objections to the Nelson Declaration on the ground that he lacks personal
13  knowledge are OVERRULED. Mr. Nelson attested that he reviewed the application for
14  reinstatement, the medical records in question, and that he made the decision not to reinstate the
15  policy. This testimony supports the conclusion that he has personal knowledge of those facts.

16      **C.**    **Great-West Is Entitled to Summary Judgment on Korbholz's Claims to the Extent Those Claims Are Based on the Decision to Terminate the Waldman Policy.**

18        Both Great-West and Korbholz move for summary adjudication on the issue of the meaning
19  of the term "paid" as it is used in the Grace Period provision of the Waldman policy.

    **1. Applicable principles of contract interpretation.**

21        The Grace Period provision of the Waldman Policy provides, in part: "If the premium due is
22  not paid within the grace period, all coverage under this policy will cease at the end of the 60 day
23  period." (WALD00008.) When a court is called upon to interpret an insurance contract, the
24  normal rules of contractual interpretation apply. *See AIU Insurance Co. v. Superior Court*, 51
25  Cal. 3d 807, 821 (1990). "Under statutory rules of contract interpretation, the mutual intention of
26  the parties at the time the contract is formed governs interpretation." *Id.* (citing Cal. Civ. Code §
27  1636). In general, the parties' intent is to be inferred from the language of the contract itself. *See*
28  *id.* at 822 (citing Cal. Civ. Code § 1639.) "The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a

8

special meaning is given to them by usage controls judicial interpretation." *Id.* (internal quotation marks and quotations omitted); *see also* Cal. Civ. Code §§ 1638, 1644. Under these rules, therefore, when the meaning a lay person would ascribe to the contract language is not ambiguous, courts are to apply that meaning. *See AIU Insurance* Co., 51 Cal. 3d at 822. The fact that a term may not be defined in an insurance policy or the fact that the parties disagree about the meaning of a term does not lead to the conclusion that the term is ambiguous. *See Nava v. Mercury Cas. Co.*, 118 Cal. App. 4th 803, 805 (2004.)

If, however, the terms of a contract are uncertain or ambiguous, the ambiguity is "resolved by interpreting the ambiguous provisions in the sense the promisor ... believed the promisee understood them at the time of formation." *Id.* (citing Cal. Civ. Code § 1649).[6] When application of that rule fails to resolve an ambiguity, the ambiguous language is to be construed against the party who created the uncertainty. *See id.* (citing Cal. Civ. Code § 1654). In the context of insurance, ambiguities are generally resolved in favor of coverage. *See id.*

"An insurance policy provision is ambiguous when it is capable of two or more constructions both of which are reasonable." *Suarez v. Life Ins. Co. of North America*, 206 Cal. App. 3d 1396, 1402 (1988). However, a policy provision cannot be found ambiguous in the abstract. *See Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1265 (1992). Rather, the policy terms must be "construed in the context of [the] instrument as a whole, and in the circumstances of [the] case." *Id.*

### 2. "Paid" means that Great-West has received a payment.

In this case, Great-West contends that the term "paid" should be construed to mean that premiums or annual premiums are paid when they are received by Great-West or its agent. Korbholz contends that the term should be construed to mean that premiums are "paid" when they are deposited in the mail, *i.e.* Korbholz asks that the Court apply the "mailbox rule." *See, e.g., Huizar v. Carey*, 273 F.3d 1220, 1223 & 1223 n.3 (9th Cir. 2001).

---

[6] This rule of construction is applied in such a fashion so as to protect the objectively reasonable expectations of the insured. *See AIU Insurance Co.*, 51 Cal. 3d at 822.

9

The term "paid" is not specifically defined in the Waldman policy but that does not lead automatically to the conclusion that it is ambiguous or uncertain. *See Nava*, 118 Cal. App. 4th at 805. Applying the principles of statutory construction set forth above and reading the Waldman policy in its entirety, the Court concludes that the term "paid" is used throughout the Waldman policy in a variety of contexts that support Great-West's construction of the term and that undermine Korbholz' proposed construction.

By way of example, the Policy Value Account provision of the Waldman policy states that premiums are credited to the Policy Value Account on the date they are *received* and that the account earns interest as of the date the premiums are *received*. (WALD00012.) That provision suggests that Great-West does not consider that a payment is "paid" until it is "received." Further support for Great-West's proposed construction comes from the Annual Statement provision of the Waldman policy. That provision states that the Annual Statement will show, *inter alia*, "premiums paid and interest credited since the last statement." (WALD00010.) The only way this provision makes sense is if the term "paid" is construed to mean "received." Korbholz's proposed construction is not logical because Great-West would be not be able to include in the annual statements premiums that were "deposited in the mail" but not "received."

The Cost of Insurance provision further supports the construction that "paid" must mean "received." That provision provides that "[a]fter the first policy year, in any month for which a premium is not paid the monthly service charge will be the lesser of the monthly service charge shown on page 3, and the amount of interest in excess of the guaranteed rate credited for the previous month." (WALD00023.) Similarly, the Expense Charge provision provides that "[t]he [expense] charge is a percentage of all premiums paid." Again, if "paid" means "deposited in the mail," these provisions would have no meaning because Great-West could not could not calculate the service or expense charges unless it had "received" a premium.

Finally, in the Court's view the most persuasive support for Great-West's construction of the term paid comes from Great-West's Past Due Notices, which each state that "[i]f payment of at least the minimum amount is not *received*" by the end of the Grace Period, "the insurance protection will lapse." (Ruby Decl., Exs. 3, 6, 9 (emphasis added).) *See Babikian v. Paul Revere*

10

*Life Ins. Co.*, 63 F.3d 837, 840 (9th Cir. 1995) (court may look to extrinsic evidence to determine whether a contract is ambiguous).[7] Indeed, Korbholz's prior conduct in responding to the Past Due Notices suggests that he understood that Great-West had to receive payments before the Grace Period expired to prevent coverage from lapsing. (*See, e.g.,* Ruby Decl., Exs. 3-4, 6, 8.)

As such, the Court finds Korbholz's reliance on *Huizar* and the additional authorities he cites relating to application of the mailbox rule to be inapposite. (*See* Korbholz Mot. at 11-12 & 12 n.8 (citing cases).) In *Huizar,* the Ninth Circuit was not called upon to interpret an insurance policy; nor was its statement of the mailbox rule in that context the holding of the case. Rather, the Ninth Circuit noted this general principle in a footnote discussing the application of the mailbox rule in a number of different contexts. Further, in many of the cases on which Korbholz relies, the courts acknowledged that the mailbox rule would not be applied if the parties agreed to the contrary. *See, e.g., Estate of Beinhauer v. Aetna Casualty & Ins. Co.*, 893 F.2d 782, 786 (5th Cir. 1990); *Colonial Life Ins. Co. v. Wilson*, 246 F.2d 922, 927 n.10 (5th Cir. 1957). Here, Great-West made clear to Korbholz that Great-West had to *receive* overdue payments by a specified date or coverage would lapse. (Ruby Decl., Exs. 3, 6, 9.) This fact, in conjunction with Korbholz's prior responses to Great-West's Past Due Notices, undermine his contention that the overdue premium was deemed "paid" when he put it in the mail. Rather, these facts demonstrate that the parties agreed the mailbox rule would not be applicable, at least as to overdue premiums. *See Venne v. Michigan Mutual Ins. Co.,* 425 N.W.2d 109, 110 (Mich. App.), *mod. on other grounds*, 431 Mich. 861 (1988) (rejecting application of mailbox rule where insurance company had sent three to four notices to insured stating that payment needed to be received by insurer before coverage would be reinstated); *Thomason v. Schorr*, 587 P.2d 1205, 1206 (Colo. App. 1987) (rejecting application of mailbox rule and affirming summary judgment in favor or insurer where notice to insured stated that payment had to be received before coverage would be

---

[7] Korbholz urges the Court to consider the manner in which the term "paid" is used in the contract between Great-West and TAG, which supports his contention that paid means deposited in the mail. However, Great-West and TAG entered that contract well after the Waldman policy was issued and there is no suggestion that it was intended to modify or apply to the Waldman policy in any way. As such, it cannot help Korbholz.

11

1 renewed); Couch on Insurance § 73:61 (noting that contract may exclude operation of mailbox rule

2 when premium in question is overdue).

3 Therefore, the Court finds that Great-West is entitled to summary adjudication on the issue

4 of the meaning of the term "paid."

> **3. Great-West has met its burden of showing that it did not receive Korbolz's check within the Grace Period, and Korbholz has failed to demonstrate that a disputed issue of fact exists.[8]**

7 Having determined that "paid" means "received," the Court must next determine whether or

8 not the undisputed facts demonstrate that Great-West did not receive the check Korbholz sent on

9 May 28, 2002 by May 31, 2002, a matter on which Korbholz would bear the burden of proof at

10 trial. To meet its burden on summary judgment, Great-West acknowledges that it relies on

11 circumstantial evidence, primarily in the form of TAG's standard practices.

12 First, Great-West points the Court to the provisions of its contract with TAG.[9] That

13 contract stated that "TAG will perform its services ... for the Company in a timely and efficient

14 manner and with due care, diligence and prudence pursuant to the production standards contained

15 in Exhibit 7." (Ruby Decl., Ex. 19 at GWL 0067.) The production standards in Exhibit 7 provide

16 for bank deposit of receipts on the same day. (*Id.* at GWL 0091.) Although the terms of the TAG

17 contract are not dispositive, the May 28, 2002 check bears the following stamp: "774495 - JN 4

18 02." (Ruby Decl., Exs. 10, 18.) Pamela Anderson, TAG's Premium Accounting Manager,

19 testified that TAG's standard procedures for processing checks involve matching a check to the

20 correct policy account, crediting the account with the amount of the check, and stamping the check

---

[8] Korbholz asserts that the Grace Period did not start running until June 1, 2002. (*See* Korbholz Mot. at 19.) However, the uncontroverted evidence demonstrates that the Grace Period was triggered on April 1, 2002, when there were insufficient funds in the Policy Value Account to cover the Cost of Insurance. (*See* Ruby Decl., Ex. 5-8.) The Waldman policy provides that "[i]f premium payments cease, coverage under this policy ... will continue until the Policy Value Account, less any policy loan, is insufficient to cover the monthly Cost of Insurance. *When the amount is insufficient, the Grace Period provision will go into effect.*" (WALD00012 (emphasis added).) As set forth above, the Past Due Notices sent by Great-West required payments to be received by a date certain, which was the date on which the Grace Period expired. (Ruby Decl., Exs. 3, 6, 9, 16.)

[9] Although the contract between TAG and Great-West is not relevant to the issue of how the Waldman policy should be interpreted, it is relevant to the issue of whether the check was received within the Grace Period. TAG was delegated by Great-West to process premiums, and TAG's standard procedures are central to the resolution of this question.

12

1   with a unique number and the date of processing. (Declaration of Pamela Anderson ("Anderson
2   Decl."), ¶ 5.)

3        "Evidence of the ... routine business practice of an organization, whether corroborated or
4   not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the ...
5   organization on a particular occasion was in conformity with the ... routine practice." Fed. R. Evid.
6   406. Ms. Anderson also distinguished the type of stamp placed on the May 28, 2002 check from
7   the received stamp placed on the letter and application for reinstatement. (Anderson Decl., Ex. A.)
8   Finally, in her deposition, Ms. Anderson discussed a premium collection report for June 3, 2002,
9   which started with an item numbered 774453, and she testified that the item number referred to the
10  stamps placed on the checks TAG receives as premium payments and on any cover letters.
11  (Deposition of Pamela Anderson at 65:2-66:16).[10] Thus, Ms. Anderson's testimony supports
12  Great-West's position that the check was received and processed on June 4, 2002, as indicated by
13  the stamp on the check, in conformance with TAG's standard practices.

14       Korbholz counters this evidence by speculating about what might have happened to the
15  May 28, 2002 check. (*See* Korbholz Mot. at 18.) Korbholz cannot satisfy his burden to avoid
16  summary judgment through mere speculation. *See Matsushita Elec. Indus. Co. v. Zenith Radio*
17  *Corp.*, 475 U.S. 574, 586 (1986) (party opposing summary judgment cannot rest on
18  "metaphysical doubt" as to the material facts). Rather he was required to come forth with specific
19  evidence showing the existence of a genuine issue for trial. *Keenan*, 91 F.3d at 1279. Having
20  failed to do so, the Court concludes that Korbholz has not met his burden of showing that a genuine
21  issue of material fact exists with respect to the date on which Great-West received the May 28,
22  2002 check. Accordingly, Great-West is entitled to judgment in its favor on Korbholz's claims for
23  declaratory relief and breach of contract based on the termination of the Waldman policy.
24  *Celotex*, 477 U.S. at 323.

25       Great-West also is entitled to judgment in its favor on Korbholz's cause of action for
26  breach of the implied covenant of good faith and fair dealing based on the termination of the

27
28      [10]    Excerpts from Ms. Anderson's deposition are attached as Exhibit G to the McKinney Supp. Declaration.

1 Waldman policy. Because Great-West did not breach the contract by terminating the policy based
2 on Korbholz's failure to pay an overdue premium within the Grace Period, it cannot be said that
3 Great-West engaged in bad faith conduct in terminating the policy. *See, e.g., Buxbaum v. Aetna*
4 *Life and Casualty Co.*, 103 Cal. App. 4th 434, 452 (2002) (affirming summary judgment in favor
5 of defendant and finding that because plaintiff was not entitled to benefits under the policy,
6 defendant neither breached contract nor engaged in bad faith by denying benefits; parties disputed
7 meaning of provision of insurance policy, and trial court found in favor of insurer on meaning of
8 policy provision). *Cf. Guebara v. Allstate Insurance Co.*, 237 F.3d 987, 992 (9th Cir. 2001)
9 ("The key to a bad faith claim is whether or not the insurer's denial of coverage was reasonable.
10 Under California law, a bad faith claim can be dismissed on summary judgment if the defendant can
11 show there was a genuine dispute as to coverage.").

**United States District Court**
For the Northern District of California

1  **C.  Great-West Is Entitled to Judgment In Its Favor on Korbholz's Claims to the Extent Those Claims Are Based on Great-West's Decision Not to Reinstate the Waldman Policy.**

Great-West also moves for summary judgment on Korbholz's claims for breach of contract and breach of the implied covenant of good faith and fair dealing based on Great-West's decision not to reinstate the Waldman policy. Great-West contends that the decision to reinstate is discretionary. Great-West also contends that before it decides to reinstate a policy, it also must consider evidence of insurability. Great-West argues that it declined reinstatement because of changed circumstances in Mr. Waldman's medical condition.

In support of this aspect of its motion, Great-West points to the Reinstatement provision of the Waldman policy, which states that the "policy *may* be reinstated" and that Great-West "must receive: evidence of insurability for the Insured ... ." (WALD0009.) This provision of the policy supports a conclusion that reinstatement is not automatic. That conclusion is further supported by the letter Great-West sent to Korbholz, which states that "[y]ou may complete the enclosed application for reinstatement and return it with a payment of $6,000.00  Upon receipt of your application, we will *consider* reinstating the coverage on each proposed insured. Additional evidence of insurability may be required before we can *consider* reinstatement." (Ruby Decl., Ex. 11 (emphasis added).)

Great-West also relies on the testimony of Joel Nelson, who is the Great-West representative who considered Mr. Waldman's application for reinstatement. Mr. Nelson testifies that he received Mr. Waldman's application for reinstatement, which disclosed that Mr. Waldman had undergone an angioplasty procedure and also had heart-bypass surgery. (Nelson Decl., ¶ 2; Ruby Decl., Ex. 12.) Based on that application, Mr. Nelson requested Mr. Waldman's medical records, reviewed them, and determined that Mr. Waldman did not present an acceptable life insurance risk. Accordingly, Great-West declined the application to reinstate the Waldman Policy. (Nelson Decl., ¶¶ 3-4.)

This evidence is sufficient to negate Korbholz's assertion that Great-West breached the terms of the Waldman policy by not reinstating him upon receipt of the application, an essential element of the cause of action for breach of contract. *See Careau & Co. v. Security Pacific*

15

*Business Credit, Inc.*, 222 Cal. App. 3d 1371, 1382 (1990) (setting forth elements of cause of action for breach of contract). The Court also finds that this evidence is sufficient to negate essential elements of Korbholz's claim for breach of the implied covenant of good faith and fair dealing. *See, e.g., Carma Developers (Cal), Inc. v. Marathon Development California, Inc.*, 2 Cal. 4th 342 (cause of action for breach of the implied covenant of good faith and fair dealing cannot be based on conduct that is permitted by express terms of contract); *Guebara*, 297 F.3d at 992.

In response, Korbholz argues only that Great-West's motion on the reinstatement issue is premature and maintains his position that the Waldman policy had not terminated. (Korbholz Opp. at 22-23.) Korbholz offers no evidence in opposition to Great-West's motion and, therefore, fails to meet his burden to show that a genuine issue of material fact exists on this claims. *Keenan*, 91 F.3d at 1279. Accordingly, Great-West is entitled to summary judgment on Korbholz's claims with respect to the decision not to reinstate the Waldman policy. *Celotex*, 477 U.S. at 323.

### D. Korbolz Failed to Meet His Burden of Showing That He Would Be Entitled to Relief From Forfeiture.

In at footnote in his motion for partial summary judgment, Korbholz asks that the Court apply California Civil Code § 3275 to avoid forfeiture of the Waldman policy. Section 3275 provides that a party in default of an obligation may be relieved of a forfeiture in certain circumstances. *See, e.g., Superior Motels, Inc. v. Rinn Motor Hotels, Inc.*, 195 Cal. App. 3d 1032, 1064 (1987). This is an equitable remedy that a court may grant in its discretion. *See id.* However, the party seeking relief from forfeiture must plead and prove facts justifying application of the statute. *Holiday Inns of America, Inc. v. D. Manley Knight,* 70 Cal. 2d 327, 330 (1969). Setting aside the inadequacy of the briefing on this issue, the Court concludes that based on the factual record presented, Korbholz has not met his burden of proving he is entitled to summary adjudication of this issue. Accordingly, his motion is denied on this basis as well.

## IV.  CONCLUSION

For the reasons set forth herein, the Court GRANTS Great-West's motion for summary judgment in its entirety and DENIES Korbholz's cross-motion for partial summary judgment.

**IT IS SO ORDERED.**

Dated:  June 10, 2005                                              /s/ Jeffrey S. White
                                                                                JEFFREY S. WHITE
                                                                                UNITED STATES DISTRICT JUDGE